WIEEIAM AYEETT, the grandson, was. seised in fee simple of a lage tract of land in Kingwilliam county, of which part was his dwelling plantation, and other parts were occupied by tenents; was seised in fee simple of lands in James city, Warwick and Bedford, counties; — and was in-titled to fourteen hundred acres, part of a tract of land, likewise in the county of Kingwilliam, which had been demised for 999 years, (a) of this term, if the lease were made, as it is supposed, for it is not among the exhibits, to have been made, since the settlement of this country by europeans, perhaps 900 years, or more, remained unexpired, at the time of his death, for recovering possession of part of the leasehold land, witheld by the husband of John Ayletts widow, or one claming under him, an action of trespass and ejectment had been commenced by William Aylett, the grandson, *in the name of his lessee, he died before the trial, afterwards a case, made by agreement between his representatives and the other party in that action, instead of a special verdict, stating the facts, was argued, and a judgement given, affirming the title of the lessor of the plaintiff; in consequence of which his executors obtained the possession.
That William Aylett, the grandson, knew his title to the leasehold land to be a term for years only doth not appear, the contrary is more probable, because his grandfather William Aylett, who owned all the demised land, in his testament, calleth it, several times, ‘land bought,’ doth not once mentiorl a lease, and, after devising the greater part of the tract to three of his-sons, namely, Philip, John, and Benjamin, *225 devised 1200 acres the remainder of it, to four daughters severaly, and to the heirs of their respective bodies, with remainders in default of such heirs, annexing slaves to every parcel, and, in two of those devises, declaring that the slaves so annexed should DESCEND pass and go, as part of the B'REEHOED. and John Aylett, in his testament, by which William Aylett, the grandson, claiming under his father, derived the title asserted by the judgement aforementioned, doth not appear to have supposed his title to be less than a fee simple.
William Aylett, the grandson, by his testament, in april, 1780, without taking any notice of a lease, devised in these words: i give to my son, Philip Aylett,’ who is the plaintiff, ‘the plantation on which i at present live, and AEE MY HANDS IN KING-WIEEIAM, also my land in Drummonds neck, in James city county, to him and his heirs,’ and after devising his lands in Warwick and Bedford to his son William Aylett, one of the defendents, and declaring his will to be, that his wife should hold and enjoy any part of the aforesaid lands, during her widowhood, to employ thereon certain slaves, to be alloted to her, added these words: ‘all the residue of my estate of what kind soever, i give and bequeath to my wife aforesaid and my children, to be equally divided among them:’ and died so seised and intitled.
The plaintiff, after he had, by some events not necessary to be now stated, become intitled to the estate devised to him, brought his bill in the high court of chancery, claming the leasehold land, to which his father had been intitled, and praying a decree for the possession and profits thereof.
The defendents by their answer, objected, that William Aylett, the grandson, had no power to devise the leasehold lands, because he had a right to them only, without the possession, at the time of his death, which bare right, being a chose in action, *was said to be not transferable by law; and, if it were transferable, the defendents insisted that it was not comprehended, in the devise to the plaintiff; and that the words, ‘all my lands,’ therein were satisfied by the part of them whereof that testator was seised in fee simple; and that the leasehold land was included in the residuary bequest to the wife and children.
The cause was heard, on the bill, answer, and exhibits, the 13 day of may, 1793.
The court, in the decree, slighted the first objection, supposing to be indisputable, first, that a chose in action is assignable in equity, and secondly, that one may bequeath that which he can assign *and the defendents counsil not urging the objection, or urging it so faintly as to betray a consciousness that it was not maintainable.
Upon the other point, the counsil for the defendents only quoted and applied the resolution, by the court of kings bench, of the first question staled in the case of Rose versus Bartlett, in trinity term, 7 Car. 1.
The case to be found in the 2<32, 3 and 4, pages of reports of cases adjudged during the first sixteen 3rears of the reign of king Charles the first, collected and written in Irench by George Croke, and after his, death revised and published in english by Harbottle Griniston, was
‘Ejectione firtnae. of the demise of John Rose and Elizabeth his wife, of forty acres of land, and two acres of meadow, in Burn-ham, for three years, upon not guilty, a special verdict was found, that Philip Schudamore was seised in fee of the land in the declaration, anno 44 Elizabeth,’ and by indenture demised it, by the name of four closes of pasture in Burnham, for a hundred years, to Richard Batyne; and that Richard Batyne entered and was possessed, and being so possessed, and seised in fee of other lands and tenements in Burnham, afterwards, viz. duodecimo aprilis, tertio Caroli, made his will in writing, which is found in haec verba: ‘i will that my wife Elizabeth shall have Burnhams and the lands thereunto belonging, being three half acres in Eentfield. and my will is, if she do marry, my son Nicholas shall have Burn-hams, and three half acres lying in Eent-field. item i will my son Bartholomew shall have for his maintenance out of the land 51. yearly, as long as she keepeth herself unmarried, item i will and bequeath to my said wife Elizabeth all the rest of my lands, lying in the parishes of Burnham and Hitcham, during the time of her life, and afterwards to my son Bartholomew. also i make my wife my full *and whole executrix of all my cattle, corn, and moveable goods: except such as i have appointed to be sold for payment of legacies,’ prout per le volunt, &c. they find that Richard Batyne died, and the said Elizabeth proved the will in the prerogative court, quodque administra-tío omnium bonorum, jurium accreditorum dictum Richardum Batyne et ejus testamen-tum qualitercunq’ concernent’ by the judge of the prerogative court, was committed to the said Elizabeth, that she afterwards took to husband the defendent, whereby they were possessed of the said lease: and that the said Bartlett assigned that lease to Richard Hammond, upon the condition for the payment of 30 pounds, at a day certain, who, failing of tiie payment thereof, reassigned afterwards that lease to the defendent; that the said Elizabeth died, and afterwards the said Bartholomew died, and that Elizabeth, the wife of Bartholomew, obtained letters of administration de bonis Richardi - Batyne non administral’ by Elizabeth • the wife of Richard Batyne, who took John Rose to husband, and they let to the plaintiff, and the defendent ousted him, and if, &c.
This case was argued by Calthorp for the plaintiff, and by Germin for the defendent.
The first question was, whether this lease for years be devised to Elizabeth for life, *226 remainder to Bartholomew? and all the justices (absente Richardson) resolved, that if a man hath lands in fee, and lands for years, and deviseth all his lands and tenements, the fee simple lands passed only, and not the lease for 3'ears; and if a man hath a lease for years, and no fee simple, and deviseth all his lands and tenements, the lease for years passeth; for otherwise the will should be merely void.
Secondly, they all agree, that if one de-viseth his land, which he hath by lease, to his executor for life, the remainder over, that there ought to be a special assent thereto by the executor, as to legacy, otherwise it is not executed: and there was not here any special assent.
Thirdly, Jones and myself were of opinion, that it appears here that he had other lands in fee, which he devised to his wife, durante viduitate; and other lands which he devised unto her, for life, the remainder over, and then that devise may not extend to that lease, but Berkley to the contrary, because it may be that land devised, as long as she is unmarried, is the sole land which he had in fee: and the other land devised absolutely is the lease for years; but it was thereto answered, that the devise is unto her, for life, of the lands in Burnham and Hitcham, and clearly no part of the lease land extends into Hitfcham; so as it is clear, it extends not to lease lands, but to freehold lands.
*Eourthly, Richard Batyne making his wife his sole and whole executrix of all his cattle, corn, and moveable goods, and not mentioning what shall be done concerning the residue of his estate ; whether the wife be absolute executrix quoad all his estate, or only particular executrix quoad his cattle, corn, and moveable goods, and not quoad his leases, and his debts ? and as touching that point we all agreed, that one may make several executors ; the one quoad things real, the other quoad things personal, and may divide their authority ; yet quoad creditors, they are all executors, and as one executor, and may be sued as one executor, 19 H. 8. 8. Dy. fol. 3. 32. H. 8. Br. Exec. 155. but Jones justice and myself conceived, as this case is that she is sole and absolute executrix for the whole estate, as well leases as debts, and other things; for when he saith, that she shall be his sole and whole executrix of his cattle, corn, and moveable goods, it is but an enumeration of the particulars, and no exclusion of any, especialy when he doth not make any other executor, for the residue: and catalla in latin extends to all things, and it may be intended, that so was the intent, when he made not any other executor, but Berkley justice conceived, that she is a special executrix quoad the things enumerated, and no general executrix.
The fifth question was, admitting that she is no absolute executrix quoad all the estate, but quoad the particulars specialy named, and she proving the will, and it being found, that administration was committed unto her omnium bonorum, &c. prout antea, whether that be a general administration committed or only an administration of the goods whereof she was made executrix? and Berkley held, that it is but a special administration because it is bonorum, jurium & creditorum praedict’ Richard Batyne et praedict’ testament’ con-cernent’ and that coupled to the testament; so that it extends no further than the will, but Jones and myself were of opinion, that it was a general administration committed; for juriumet credi torumare general words, and the word et should be expounded as aut, and it cannot be tied only to the testament; for there be not any words of debts, as creditorum imports; and they be as general words, as are useful in general letters of administration; wherefore upon all the matter, .justice Jones and myself were of opinion against the plaintiff, that he should be barred, but justice Berkley e contra, .per quod adjournatur. ’
And the counsil for the defendents in the principal case relied upon the authority of that resolution of the first question in the case cited, which as he thought, favoured the right clamed by his clients, not less than if the case had been, for that purpose, contrived by himself, and
*That judge of the high court of chancery, for reasons hereafter assigned, not allowing the authority of the resolution quoted to be more decisive than if the case had been so contrived by the counsil, although thdt resolution had been quoted in Westminsterhall half score of times, without disapprobation, and once or twice with approbation, delivered this opinion: ‘that the plaintiff, by the testament of his father, was intitled to the leasehold land clamed by the bill, but that the said land was subject as a specific legacy, to payment of that testators debts;’ and the court decreed the defendents, who were executors, to deliver to the plaintiff possession, and to account with him for the profits, of the said leasehold land, upon his entering into bond, with surety, for payment of his proportion of those debts to which a specific legacy is liable.
In justification of this opinion and decree what followeth is submitted to censure.
A man, not acquainted with law cases, to whom, after reading the testament of William Aylett, the grandson, and being informed of the facts before stated, was propounded the question, whether Philip Aylett, the devisee, was intitled to all his fathers lands in the county of Kingwilliam, and, among them, to the lands which he had a right to hold for 900 years only? after recovering from the surprise, which a controversy upon such a devise, in which doth not occur an .ambiguous sentence, an equivocal word, or a technical term, must occasion, would probably not haesitate to answer the question affirmative^, if he did not think it too trifling to be asked or answered, observing that the fee simple lands and the leasehold lands both were the testators lands, although one were his for an indefinite time, and the other were his *227 for a definite time; — that by the complexion of the testament, he, who made it, seems to have intended to divide all his landed property between his two sons, and out of his other estate to raise portions for daughters, which is the most usual mode of provision for a family of children;— and that the presumption in favour of the devisee Philip is the stronger, if the testator knew not that his title to the leasehold land was less than a fee simple, he would probably have observed further, if the testator had said, ‘i give to my son Philip Aylett all my lands freehold and leasehold, ’ the terms ‘freehold and leasehold’ would not have been any thing more than enumeration of the species, whereof lands was the genius; and that a devise of the genius in-cludeth all its species, and that if William Aylett, the grandson, had been seised moreover of lands holden for the life of another, where the cestuy que vie survived the testator, these lands would have been comprehended *in the devise, as well as those holden in fee simple, and for term of j'ears, because included equaly in the generical term.
A man, not altogether unacquainted with law cases but, emancipated from a servile obsequiousness to the authority of adjudications in some particular instances, to whom was propounded the same question, in verification of the affirmative answer to it, will endeavour to shew the only true meaning of the devise in the testament of William Aylett, the grandson, to the plaintiff to be, that he should have the leasehold as well as the fee simple lands in Kingwil-liam county, and that, in such a case as this, authority ought not to prevale against that intention.
I.The true interpretation of the devise will appear from these considerations.
1. Translation, ex vi termini, imports motion, and consequently change of place, for philosophers, of whom some have attempted to define motion, and others have denied motion to be defineable, however they differ in that, have all agreed change of place, to be either an essential part,, or a necessary concomitant, of motion, and, if to moral entities we may, by analogy, attribute place, which naturaly signifietli the part of space occupied exclusively by a body, dominion, right, property, may, when it is transferred, be said to change place i. e. to change the owner.
2. Translation of dominion, right, property, by testament, is perfect, at furthest, so soon as the devisee or legatary con-senteth to accept the subject devised or bequeathed, (b) and according to the opinion of some, at the death of the testator.
3. If the place of the subject transferred be changed, by the transferring act, and the translation be perfect, so soon as the subject of it is accepted; the subject transferred is not the thing in which the dominion, right, property, is exerciseable: for the place of the land, if that be the thing, is not changed; the slave, horse, piece of furniture, garment, library, philosophica apparatus, if that be the thing, may remain where it was, and yet the dominion, right, projjerty, thereof may be perfectly transferee!, — the place of the dominion, right, property, may be changed, so that,
4. When one saith, he deviseth land, or bequeaths any other thing, the terms are eliptical; some words are left out which are understood; and, in such a case, the testator must mean that the devise or bequest shall have, not a sensible immediate operation upon the land or other thing said to be devised or bequeathed, *but a mystical operation on his dominion, right, property, over to, in, the land, or other thing.
Thus Justinians compilers, Bracton, who followed their method, and other exact writers, intitule their tractates upon such subjects de acquirendo rerum DOMINIO.*
He, who may incline to ask, by wajr of objection to what is here stated, do men never on such occasions, speak or write, without shrouding, by a figure, half of what they mean, is desired to consider the quotations in the note, (c)
Some may ask too, if translation in general do not operate immediately upon the thing said to be transfered, what, in the particular cases of a feoffment of lands, and a gift of moveable goods, do livery of seisin, in one, and tradition, in the other, mean? to which question the answer is, those ceremonies are images of the transition of dominion, right, property; — possession of a thing is presumptive evidence of the possessors dominion, right, properly; delivery of the possession is a symbol representing a change of the dominion, right, property,
5. The most unerring mode of interpreting a testament, the terms of which are supposed to be equivocal or ambiguous, is by inserting the words necessarily understood :
*228 For example: in this case, where the testator, who had one tract of land, holden in fee simple, and was intitled to another tract of land, holden for term of years, both tracts in Kingwilliam county, devised all his land in Kingwilliam to his son Philip Aylett, the man, whose wonderfull sagacity enabled him after diligendy exploring the devise, to smell or spy out in it an equivo-que or an ambiguity, would perhaps admit that it vanished, if the words right to, which are proved to be necessarily understood, *were supplied; with which supplement the devise would be read thus: ‘i give to my son Philip Aylett all my right to lands in Kingwil-liam: in which case,
6. That the devisee would have been in-titled to the leasehold lands in question, as well as to the fee simple lands, is affirmed, with confidence, because the conclusion is believed to be undeniable, and, if so, the decree was correct, but
It is said to be proved, by authority, that is by the forementioned case of Rose versus Bartlett, to be erroneous; and truth, reason, justice, and indisputable principles of law, conspiring together, will sometimes no more enable a demand to stem the torrent of authority than a fair wind, aided by concurrent tides, will be able to drive through the syrtes the bark
lllisam vadis atque aggere cinctam arenas.
II. On this part of the case, observations will tend to shew
1. That judicial determinations of questions not legal in their nature, although they must, so long as they remain unre-versed, be definitive in the cases wherein the questions were necessarily discussed, and determined, ought not to be precedents of decisive authority, when similar questions occur in other cases, if judges in the latter discover the determinations in the former to have been erroneous.
2. That a false judicial interpretation of one mans testament, if the words be not law terms, of a meaning in that science different from thei'r meaning in ordinary discourse,- ought not to be a precedent au-thorising a like interpretation of like words in the testament of another man.
3. That the case of Rose versus Bartlett is not a precedent of decisive authority in this case, if in any other.
1. That questions, which cannot be called questions of law, are frequently brought before courts of judicature the experience of every day sheweth.
The determinations of such questions by those courts ought not to be precedents of decisive authority, unless every judge of them wqre equal to the man whom Juvenal describes, Sat. Ill v. 77. (d) — unless every judge were such a prodigy of genius and learning as the man, hight ‘the admirable Chrichton,’ who, inviting all the literati, whithersoever he went, to dispute with him, and undertaking to answer rightly every question, which could be propounded, in any art or science, an in any of twelve languages, and this either in verse or prose, at the choice of the autagonist or querist, is reported to have astonished the auditors at all the trials by proving himself not to be a vain boaster.
*But such phenomena are less frequent than comets, (e) and therefore the authority of sentences by judges of law, who certainly are not always perfect adepts in everjr science, may be, in many cases, disallowed by their successors, if these, better informed, discover the sentences to be erroneous. And this the en-glish judges scruple hot to do, even irt cases where the questions were purely legal, as well as in other cases.
If a man had devised a tract of land, on one side of a determinate line, to be laid off in a triangle, of which the other sides should be such that the sum of their squares should be equal to the square of the given line; and if any court had determined upon such a devise that the angle subtending the hypotheneuse should be an oblique angle; ought that determination to authorise a similar sentence in another case, where the same question occurred, although, in discussing the latter, should be demonstrated, as may be demonstrated, that the angle, which alone can answer the conditions of the question, is a right angle?
If such a disputes as Archimedes rightly decided between Hiero, king of Syracuse, and the mechanic, who was accused of pilfering some of the gold delivered to him for making a crown, and of supplying the place of what was withdrawn by baser metal, coming before courts of law had been determined by a mode known to be fallible ; would not a court of law now, disregarding any number of those determinations, resort to the hydrostatic experiment, which is infallible?
In adjusting the proportion, which a tenent for life ought to have of the purchase mqney, for which an estate of inheritance should be sold, would a court, at this day, regard the rule observed in such cases by the courts formerly, or have recourse to the problems and tables invented and formed for that purpose by the accurate Demoivre, Halley or Price?
In a question concerning the legitimacy of a posthumous child, which is a physiological question, depending upon the time *229 -of birth after a husbands death, ought a •court to regard the authority of opinions, by which former judges of law had limited '"‘the time of gestation, so much as the opinion of Hunter, the eminent anatomist and accoucheur?
If the mother had taken another husband, so soon, after the death of a former, that the child might have been begotten (f) by either, would a court at this day, permit the child, even if authority could be produced (which seems, by Cokes com. on Hyt. fol. 8. b, not impossible) for permitting him, to chuse his father? (g)
Formerly, no proof of anything, less than impossibility of procreation, seemed admissible to bastardize a child, who was born in wedlock, if he might have been begotten, whilst the husband was infra qratuor maria, for this numberless authorities are extent, and some of them later than the determination of the case between Rose and Bartlett, do courts at this time abide by those authorities?
In Brookes abridgement, title administer, n. 47, in Swinburnes treatise of testaments, part 7, sect. 8 and in the life and opinions of 'Tristram Shandy, gentleman, vol. 5, p. 195, we meet with the case stated In the note, (h)
*This case in Cokes third book of reports, fol. 40, is indeed denied to be law; because it is erroneous; and, for the same reason,
2. The interpretation of a devise in one mans testament, if the interpretation be erroneous, ought not to be a precedent authorizing a like interpretation of a like devise in another mans testament.
When a court of law misinterprets a devise, a sentence, in conformity with that false interpretation, depriving one of an estate, is no less contrary to law, than the sentence which deprived a mother of her right to an estate, upon the false principle, that she was not of kin to her own child.
In neither case was the question merely legal, in the case of the devise, where no technical term occured, the question was purely philological.
The court is as much bound to fullfill the intention of a testator, according to the the meaning of his own words, as to grant administration to the next of kin.
A court of law, who, interpreting one mans words in his testament, about the meaning of which no man could have entertained a doubt, if similar words in the testament of another man had not been misinterpreted by another court upwards of 160 years before, should be guided in their determination by the authority of such a false interpretation, are affirmed to determine contrary to law, — affirmed with the more confidence, because the law doth not presume the testator to know of such misinterpretation, but, on the contrary, presuming him to be inops consilii, directs the judges to interpret his words according to what they believe to be his meaning by them, upon the supposition that he is without the aid of those who could inform him of judicial sentences, by which similar words had been misinterpreted.
Indeed recurrence, to authorities in questions upon Ihe meaning of testamentary dispositions seems improper in most cases, where terms of art do not occur.
3. If a painter, who had been desired to draw the picture of William Aylett, hearing that he resembled one Richard Batyne, ^should inquire after the latter, draw his picture, and present it for William A.yletts, most people would think the painter acted absurdly, and more absurdly, if ihe likeness which he took of Richard Batyne was not a faithful likeness, when the defendents counsil rummaging in his repertorium juridicum, his lumber room of law cases and authorities, found a judicial interpretation of some words in Richard *230 Batynes testament resembling the words in William Aylett testament, and recommended an adoption of that interpretation in the principal case, the judge of the high court of chancery thought, if he had adopted the interpretation recommended, which appeared to him false, he should have determined contrary to law, and have acted not less absurdly than the painter; for the interpretation of the testament ought to be as true an image of his intention who made it, as the portrait ought to be of him for whom it was drawn: more especially if the case of Rose versus Bartlett be not only contrary to law, as it is clearly proved to be, but, for other reasons, to be explained hereafter, ought not to have the weight of an authority.
Some judges and many lawyers revere authority so much, that they seem to believe nothing, which hath that sanction, to be wrong, and scarcely anything, which wants it, to be right, and appear to be displeased with those who have not the same kind of implicit faith.
Several years ago, in a case between Parsons and Parsons, where the question was upon the interpretation of a devise, the chagrine of the plaintiffs counsil, occasioned by the courts judgment, which he thought contrary to some authorities produced by him, broke forth in a declaration that, so soon as he should return home, he would burn all his books of reports, such an holocaust might have been an offering not altogether acceptable to Astrea; became of the reported cases are many exceeding valuable. better would have been an imitation of Prometheus, who is said to have taught men, in sacrifices, to consume on the alter the entrails and offal, that is, the vile parts of victims and to regale themselves, in jocund festivity, with the dainty parts.
Of the reports more in proportion might be spared than the barber and curate saved from Don Quixotes library; out of them, well winnowed from the chaff accumulated with them, a body of civil law may be formed, equal in value with the code, pan-dects, institutes, and novels, which were ushered into the world with imperial auspices.
American judges may contribute to such a desirable compilation ; and will not have to encounter the prejudices, and to ^struggle against the difficulties, which must occur in England, and retard a reformation of that part of the law, which is said (Co. instit. part 1. fol. 344,) to ‘consist of reports and judicial records;’ many of which reports english judges acknowledge to have been' ill founded.
But how can this be done by american judges, if they may not reject those cases in the reports, which are contrary to law, or not reject them, before they shall have been reprobated by english judges? if the case of Suffolk had not been denied by eng-lish judges, must it have been admitted by american judges to be law? in return for this deference by american judges to english authority, how would english judges respect american authority? the resolution of an american court, quoted in Westminster hall, if any counsil there should venture to expose himself to ridicule, perhaps to rebuke, by the quotation, would, no doubt, be treated, if not with fastidious neglect, like a *sus Minervam.
The judge of the high court of chancery, not supposing himself to be in such a-humiliating predicament, as that he must wait for leave from english judges, before he can venture, to reject an english determination.
III. Denied the authority of the resolution in the case of Rose versus Bartlett, upon which the defendents counsel in the principal case relied.
That it is contrary to law is believed to have been proved.
Upon that, and other parts of the case, to shew that it ought not to be respected, are observed,
I.The former part of the resolution of the first question is a dogma, merely didactic, imperious and arbitrary, for which no reason is assigned, and the reason given for the other part of it allowing leasehold lands to pass by a devise of all his lands, where the testator had only leasehold lands, seems aukward. — the reason given is, ‘for otherwise the will would be merely void.’ instead of which most other men would have given this obvious, as well as true reason, why the leasehold lands should pass to the devisee, ‘that they were devised to him.’
Again; a case might have happened in which this resolution might have been an authority on either side of the question, and with equal force, if a man, who had lands in fee simple and land for years, had devised all his lands to him who was heir at law of the testator, (i) the devise, without doubt, would have been void as to the fee simple lands, because they would *have descended, and therefore could not have passed by the devise to the heir, here then might have been urged, on one side, the leasehold lands should pass, because ‘otherwise the will would be merely void;’ on the other, that the leasehold lands should not pass, because ‘the testator had fee simple lands,’ as well as leasehold lands, (k)
2. The special assent of an executor, to whom a term for years was devised, with a remainder over, in order to execute the re- ’ mainder, seemed not necessary, as the court resolved it to be in the case quoted, if some facts stated in the special verdict be properly considered.
3. On the third question the judges dif *231 fered in opinion ; yet it seems included in the first question, on which they were unanimous.
4. One question in the case was this: Richard Batyne making his wife w'hole and sole executrix of all his cattle, corn, and moveable goods, and not mentioning what shall be done concerning the residue of his estate, whether the wife be absolute executrix quoad all his estate, or only particular executrix quoad his cattle, corn, and moveable goods, and not quoad his leases and his debts? in discussing which question, two of the judges, in order to prove the wife to have been, not a special, but a catholic executrix used one. argument, in these terms: catalla, in latin, extends to all things, turning the english word ‘cattle’ in the testament, which signifies gregarious quadrupeds, into a latin word which may include a lease of land for years, as happy an expedient as any of those which occurred to Peter, Martin, and Jack, in Swifts tale of a tub.
5. The case doth not appear, by the report of it, to have been finaly decided, and so cannot be said transisse in rem judicatam; for it ends thus: ‘wherefore upon ADD the matter justice Jones and myself were of opinion against the plaintiff that he should be barred, but justice Berkley ‘contra, per quod adjournatur. ’
For these reasons the judge of the high court of chancery, rejecting the clumsy, bungling, unfinished case of Rose versus Bartlett, as he thought it made the decree, which he believed exactly corresponded with the meaning of William Ayletts words, inquisitive to discover that meaning from those words, ^convinced that they only ought to be consulted for discovering it (l)
But he was mistaken, as it seemeth, for the court of appeals, before whom the decree in the principal case was impeached, on the 12 day of march, 1795, delivered this opinion: ‘that the testator appearing to have freehold lands in the county of King-william to satisfy the devise to his son Philip of all his lands in Kingwilliarn, the leasehold lands in question did not pass, thereby, ACCORDING TO THE UNIFORM DECISIONS ON THE SUBJECT, but passed in the residuary estate devised to the wife and children of the testator, and that there is error in the said decree,’ and therefore reversed the said decree.
Upon the reversing decree the writer of the prolusions to it will make one remark, and to it subjoin one question.
• The remark is: the terms ‘uniform decisions,’ that is, decisions in England, suggests a powerfull argument in favour of a different decision in Virginia, if the first english decision were erroneous, as it is affirmed to have been, in that country, if many and uniform decisions have established the doctrine, although it be unsound, defendit numerus. but in the principal case, if it he the only instance (and for anything appearing to the contrary it is the only instance) in which any man ever thought whether a devise of the whole, was satisfied by part, of a thing? to be a disputable question, the precedent here ought to be the reverse, as is conceived, of that in England.
The question is: when a man, who had two tracts of land in Kingwilliarn county, devised all his lands in that county, *'that is, both the tracts, to his son Philip Aylett, and when that devise is satisfied with half his lands; that is with one of the Iracts in Kingwilliarn county, this doctrine being established; whether, when the same testator devised AEL the residue of his estate to his wife and children, the devise of AEE there was not satisfied, as in the other instance, with one HALF of the residuary estate; in consequence whereof the wife would have been intitled to one sixth of one half, and to one third of the other half, that is to three twelfths or one fourth part, of the residue?

 This terrier is taken from the answer of the defendents. — Note in edition of 1795.

|Mr. G-reen has here referred to Prec. in Chan. 142, Blake v. Johnson. — Ed.—Note in edition of 1852.

 See Rutlierl'orUi on G-rotius b. 1. c. VX. s. V.-~ Note in edition of 1795.

 ‘This first aim of language is to communicate our thoughts: the second, to do it with dispatch, the difficulties and disputes concerning language have arisen almost Intirely from neglecting the consideration of the latter purpose of speech, which, though subordinate to the former, is almost as necessary in the commerce oi mankind. * * * words have been called winged; and they well deserve that name, when their abbreviations are compared with the progress which speech could make without these inventions; but, compared with the rapidity of thought, they have not the smallest claim to that title, philosophers have calculated the difference of velocity between sound and light, but who will attempt to calculate the difference between speech and thought? what wonder then that the invention of all ages should have been upon the stretch to add such wings to their conversation as might enable it, if possible, to keep pace in some measure with their minds.’ Epea pteroenta, or the diversions of Pur-ley, by John Horn Toolce, who, in a note there, hath transcribed from m le Presidente de Crosses, these pertinent words: L’esprit humain veut aller vite dans son operation; plus empresse de s’exprimer promptement, que curieux de s’exprimer avec une justesse exacto et reílechie. s’il n’a pas l’instrument qu’il faudroit employer, il se sert de celui qu’il a tout prel. — Note in edition of 1795.

 Grammaticus, rhetor, geometres, pictor, aliptes, Augur, schoenobates, medicus, magus; omnia novit. — Note in edition of 1795.

 Quintilian, who would Have a youth, intended to be an accomplished orator, to be instructed in tbe arts (and what he supposed necessary to the orator must be no less necessary for qualifying- a judge to decide rightly questions of every kind which may be discussed before him) so ut efficiatur orbis ille doctrinac, quam graeci encyclopaediam vocant, expected some might ask, quid ad agendam causam, dicendamve sententiam, pertinet scire quemadmodum in data linea constituí triangula aequis lateribus possint? aut quo melius vel de-fendet reum vel reget consilla, qui citharae sonos nominibus et spatiis distinxerit? to which he answers thus: non eum a nobis institui oratorem, qui SIT, aut FUERIT, sed imaginem quandam conee-pisse nos animo perfecti illius, ex nulla parte ces-santis. — Note in edition of 1795.

 This mi vil t have happened In the case of her, who, returning' from the interment of tier husband, told a wooer, resolved to apply early enough as he thought, that he was too late: and in the case of the ■ephesian matron who, as her story Is related or perhaps invented by Petronius, to save a living husband, la danger of capital punishment, for neglect of duty, whilst he dallied with her, in watching the corpse of one who had been gibe ted, contrived to malte a dead husband supply the place of the malefactor, stolen away by some of his friends in the guards absence. — Note in edition of 1795.

 A prince satisfactorily decided a dispute between two women, each alleging herself to have borne the same child, but a child, if he can tell «lint father begot him, must be wiser than Solomon, the mother, insuch a case, must be wiser than cither of them, why she might not be a witness in it perhaps no .good reason can be given, the lineineuts of the child itself in some instances, e. g. resemblance of one or other, or of the acknowledged children of one or the other husband might qualify the child, in propria persona to prove the matter in •question, when a roman proconsul of Sicily said to a. man of that country, 1 cannot account for the exact similitude between me and thee, since my father was never in this province:’ the Sicilian, re-i enging the insult on his mothers chasticy audacius ,'i.uani virgis et securibus subjeclo conveniebat, as Valerius Maximus observes, petulantly retorted, ‘butinyfatherwout frequently to Rome.’ — Note in edition of 1795.

 ’In the reign of Edward the sixth, Charles dulce of .Suffolk, having issue a son by one venter, and a daughter by another venter, made his last will, wherein he devised goods to his son, and died; after whose death the snn died also; but without will, without wife, and without child - his mother and his sister by the father side (for she was born of the former venter) then living — the mother took the administration of her sons goods, according to the statute of the 31st of Harry the eight, whereby It is enacted, that in case any person die Intestate, the administration of his goods shall be committed to the next of kin.
The administration being thus (surreptitiously) granted to the mother, the sister by the fathers side commenced a suit before the ecclesiastical judge, alleging. 1. that she herself was next of kin, anda, that the mother was not of kin at all to the party deceased; and therefore prayed the court, that the administration granted to the mother might be revoked, and be committed unto her as next of kin to the deceased, by force of the said statute.
Hereupon, as it was a great cause, and much depending upon its issue--and many causes of great property likely to he decided in time to come, hy the precedent to he then made - the most learned, as well in the laws of this realm, as in the civil 1 aw, were consulted together, whether the mother was of kin to her son or no.- -whereunto not only the temporal lawyers — but the church lawyers, the juris consulti — the juris prudentes-the civilians— the advocates — the commissaries — the judges of the consistory and prerogative courts of Canterbury and York, with the master of the faculties, were all unanimously of opinion, that the mother was not of kin to her child.’ — Note in edition of 1795.

Oic fam. IX. 18. Acad, 1. 4. — Note in edition of 1852.

 If Pliilii) was eldest son of William Aylett, this was the principal case.’ — Note in edition of 1795.

 When an admirer of Croke lately said, ‘his books were the best extant.’ one, to whom this eulogy was reported, observed upon it. ‘that men of the law found the cases collected by that author as useful as belligerent nations find swiss soldiers, who will fight for either of opposite parties;’ and this observation seems verified in this case of Rose versus Bartlett. — Note in edition of 1795.

 John Hooke, In his essay for the understanding of saint Pauls epistles, by consulting- saint Paul himself, observed, that sober inquisitive readers of those epistles, who had a minci to see nothing in them but lust what the matter meant, would not find the understanding of them difficult; whereas others could see in them what they pleased.
A turkish traveller, introduced into the. Vatican, when the librarian shewed the shelves on which were arranged the books relating to theology, the polyglotts. paraphrases, commentaries, translations. histories, connections, homilies, sermons, de crees of councils, polemical tracts, and many more, written in order to explane the Christian bible.said. ‘i suppose then after all this every part of your bible must be well understood.’ 'quite the reverse, answered tne librarian, controversies have muliti-plied from that cause.' whether controversies have increased or diminished by the great number of adjudications in cases where interpretations of testaments have been in question the reporter of the principal case will not pretend to decide: but he doth verily believe that in 1793. if The case of Rose versus Bartlett, which was discussed more than 160 years before, had never been published, no man would have thought whether Wil-liam Aylett, meaned to give ail the land to which in Kingwilliarn county he had any kind of right to his son Philip Aylett. a controvertable question. — Note in edition of 1795.

[*Mr. G. here refers to Plowd. 448.--.Ea.] --Note in edition of 1853.